Good morning Your Honors, Suzanne Sangree representing the Mayor and City Council of Baltimore. The District Court found Baltimore's disclosure ordinance violates the Appellee Center's free speech rights because, number one, there is insufficient evidence to demonstrate that deception actually takes place, and number two, that the health harms are in fact being caused by delays resulting from deceptive advertising. Reversal is appropriate because the District Court was required to view the evidence in the light most favorable to the non-moving party, the city in this case, and the evidence is undisputed that consumers were deceived by the Center's deceptive advertising, which alone is constitutional justification for the disclosure ordinance. The Center's executive director, Carolyn Clues, admitted that their advertising is, quote, purposefully vague. That's at JA 708. Excuse me? Why is that deceptive? Well, and you can look at the various, the many examples of the ads which are in the record, and I can cite to the pages if you want, but what matters is that women were actually misled by these purposefully vague ads. I thought that was what the question went to. What was your evidence of actual, that people were actually deceived? One source of evidence is that the helplines, the Center's director of their helpline stated that women exposed to their ads were actually misled about the services that the Center offers and contacted the Center in order to obtain abortion services there. Wouldn't the deception it would be tied to the disclaimer be some affirmative representation that the Center's actually provided abortion advice, which they did not. In other words, I understand that the Center's never, they wouldn't have done it because it's contrary to their mission, but I don't think the Center's ever gave the impression that they provided advice on how to obtain abortion, and if they had done that, then the sign, the poster would be responsive to that kind of deception, but it, I didn't see that here. To the contrary, Your Honor, if you look at JA 703, 698, and 696, you'll see that the Center is marketing itself by offering abortion and morning after pill, abortion alternatives, medical services, and the ads don't mention anywhere, JA 703 is the option line ad which says it's offering medical services, abortion, and morning after pill. 698 and 696 are the bus campaign, the bus ad campaign that the Center ran in Baltimore City in 2010 offering abortion alternatives, and 698, that's deceptive because women who saw that ad thought there were various alternatives of abortions offered there, RU 46, D&C, D&E. No, it just sounds like there are alternatives to abortion. I mean, that's a stretch. Well, it would have been, too, would have been an important word to include. Well, but it's not unclear, I mean, you're asking, abortion alternative means alternative to abortion is somewhat synonymous, isn't it? Well, we certainly can disagree about whether the ad is inherently deceptive in itself, but the ad shows that women were actually misled about what that ad meant, and they saw it, and they called the Center to schedule abortions. I thought that the advertising, such as it was, offered free counseling services primarily or pregnancy tests or sonograms, and it didn't get into facilitating an abortion. They don't actually provide abortion services, but they do indicate in their ads that they provide abortion services and medical services, and women coming to the Center believe that they can obtain abortion services there. They are presenting themselves to the public as medical clinics offering medical services, and lay people who come there are receiving vaginal sonograms. They are receiving pregnancy tests. They think they're at a clinic obtaining medical services, and a simple, neutral, factual disclosure on the wall could easily dispel that impression by telling them no abortion or comprehensive contraception is provided here. But how would that address the problem that you've presented, that people see ads on buses and they call? I mean, part of the problem is the tailwind argument. It does not seem to me, it is not apparent to me how the sign on the wall addresses what you have articulated as the difficulty. It addresses it because it immediately clears up the consumer's confusion about what services are offered. No, that's done if they call and ask. I mean, if they never get to the clinic, when they call, they see the ad that you think that you're saying is deceptive on the bus, and they call. Well, Baltimore decided it would be less burdensome for the Centers that rather than requiring a disclosure on every ad on every web page. No, but I'm saying what the North Dakota case, as I understand it, which dealt with something like this, said that if there is deceptive advertising, the remedy is to cure or regulate or counteract the deception of the advertising at the place where the advertising is being projected. And the difficulty, one of the difficulties I'm having is that I'm not sure what the link between the disclaimer is and the false advertising that's creating the confusion. The Larson Court in North Dakota not only enjoined misleading advertising, it also enjoined, quote, falsely lulling people that come to them into thinking they are in fact an abortion clinic. But did you seek an injunction here for misleading advertising? No, you didn't. The issue in the case was brought by them against the disclaimer. But see, the question is when you're pushing, when you have a compelled speech argument, one of the things that's going to be asked is whether you pursued this in the least drastic means possible. And then the question does come to mind, why not advocate false advertising itself or whatever, but why not advertise through the government's website? It seems to me there are an awful lot of ways to get at this problem. What in your mind is this problem or what in the council's mind is this problem, other than invading the waiting room of the pregnancy center itself and forcing them to have a sign that is just contrary to the core of their whole mission. I just wonder whether you couldn't have approached this in some other different ways, where the means related so much more to the ends than here. This doesn't seem to me the least intrusive means. It is the least intrusive and effective means. Requiring a disclosure on advertising, Baltimore City wouldn't have been able to reach the third party national groups that advertise on the internet and refer women to the center in Baltimore. The reason it's effective is partly because it shuts down their speech, which is a problem because somebody listening, looking at this, might never hear a single word of what the centers had to say. I disagree, Your Honor. In fact, the executive director, Carol Cluse, also disagrees. She acknowledged in testimony that the only conversation that is interrupted by the disclosure sign is that of a woman who is seeking an abortion at the center and has been misled to think that she can obtain an abortion there. That's the only conversation that would be interrupted. And the disclosure... The testimony was the effect that it would interrupt every conversation. That's their argument. That's not the testimony. That's not what the evidence shows. Do you have testimony that there's any woman who has been misled by coming into the center? Yes. There's the helpline director's acknowledgment that after the bus ad ran... I'm asking about folks that come into that center. What's your evidence? Yes, there's evidence before the city council. Tori McReynolds herself, 16 years ago, was misled by such ads. Dr. Blum? At that center? Not at that particular center, but this is a common... The testimony before the... What we want is your evidence in this case. The best evidence for this center is from the helpline director. But there was ample other evidence before the city council and now before this court of college counselors and health care providers who were treating women or counseling women who had been misled by centers in Baltimore by... significant age and not related to this locality. To differentiate this case, the decision by the district court, from the district court's decision in Tepeyac or the Second Circuit's decision in Evergreen Association? Or do you disagree with those two cases? No, those cases support our position, but if I can first speak to your point about hearsay before the city council. The city council, like most legislatures, is not bound by the rules of evidence and Turner Broadcasting Systems versus... I don't think there's any question the city council heard that, but I'm talking about evidence that proves your case here as to what happened in that way. Well, we're not starting from scratch here. What you're evaluating is whether the city council enacted an ordinance that furthers the government interests it sought to further. And the evidence supporting that is what was before the city council as well as the supplementary evidence that was added to the record during the litigation. So my question is a little bit different. What is troubling me and what I'm still working on from hearing you now is the tailoring piece. It remains a little vague to me how the notice in the waiting room is narrowly tailored to meet the goal that you articulate, given that many of the examples that you've given involve people whose confusion, if we could settle on kind of a neutral term, doesn't seem to come from being in the waiting room at all. Okay. So it does so in two ways. The disclosure on the wall both mitigates the harm as well as prevents it. It mitigates the harm because the second compelling government interest that's served is delay in access to time-sensitive reproductive health services. Although they've already made the appointment. So they've come there. They've had some delay, but it's minimized. And we have evidence in the record of the center's delay tactics once a woman is there. She's encouraged to come back for additional appointments, for sonograms, et cetera. It also prevents the harm because once this deceptive marketing tactic doesn't work in order to obtain new clients for the center, the center will stop engaging in this as a promotional endeavor. So it reaches every woman who is misled. Putting a disclosure on advertising won't reach the third-party national groups that are doing advertising on the Internet. And they're beyond Baltimore's jurisdiction. We can't require them to put disclosures on their ads. Women are still going to be referred by the option line and the decision line to come to the Baltimore centers, even though there might be a disclosure on the bus ads if the center were to continue doing bus ads. Yes, I'm glad you brought that up again. So the Evergreen case in the Second Circuit upheld a requirement that there be a neutral factual disclosure both on the waiting room wall as well as orally that there is no licensed health care provider present. They struck down... The services disclosure part of Evergreen was struck down as redundant. There's no need to delineate what medical services are not provided if you already know there's no licensed medical provider. And the interest... discussion of those issues begins because it mandates discussion that that is a decided fact. Well, that was dicta in the decision, I would posit, and that their holding was based on the fact that the neutral disclosure of what licensed services were provided there or they weren't provided there, and then the second part was redundant, that that was the basis for their holding. And in that case, New York... On rebuttal, I'll find you the exact site for that. And turning to the Tepeyac case, the Fourth Circuit en banc decision, upheld as the district court's preliminary injunction as to the neutral factual disclosure that there was no licensed medical provider available and struck down the second part. What Montgomery County's interest in that case was that women, pregnant women, thought they were obtaining prenatal care at this clinic. That's what they stated their interest was. There was no evidence of any deceptive advertising offering abortion services at the center, and there was no evidence that they were presenting themselves as a medical clinic, so they ultimately... I think one of the things that troubles me about this case is it seems to be a pretty significant intrusion upon speech in this sense. It takes right into the waiting room of the centers, and right there in the waiting room, which is right at the heart of their operation, it requires them to sort of indicate that abortion is one of a menu of choices, available to women. And if the center doesn't provide it, maybe you can go several blocks down and they will provide it. But it indicates that there's just sort of a menu of choices of which abortion, a menu of legitimate choices of which abortion is what. And that contradicts the center's entire core mission and the very reason that these people are in existence. And they're forced to convey a message which is at odds with the reason that they're in existence, which is to provide educational and counseling and adoption and other alternatives to abortion. So it does seem to me to be a fairly significant example of compelled speech. And when it's laden with content-based discrimination, because this only goes to pregnancy services, and it doesn't go to any abortion providers to explain what they're not doing. And so all in all, given the content-based problems and given the viewpoint-based problems, and given the fact that these folks are required to convey a message at odds with why they exist, you get the idea that you're trying to hobble these centers or even at worst, run them out of existence. And I just think if there's going to be something that is this problematic from a first-amendment point of view, you should have tried other things first. This seems to me to have taken the most dramatic step first and decided upon a means that is only tangentially related to the end. There's no substantial relationship. And it's just not narrowly focused. There have to be other ways to attack this problem rather than requiring the center to deny the very reason for its existence in its own waiting room. There have to be other ways of going about it. I can respond, Your Honor, but I'm out of time. Can I go ahead? Go ahead. So I would say the Ninth Circuit and the Second Circuit looked at those less restrictive alternatives that you mentioned that Baltimore should have considered and rejected them. A general government advertising campaign is not going to inform consumers about what services are offered at this particular center. Well, but if you find a part of the advertising misleading, then would you seek to address that? I think Baltimore would have a hard time getting an injunction against option line and decision line that are based outside the jurisdictional boundaries of Baltimore City. And yet they're referring women to the centers offering abortion and morning after pill. But a lot of that advertising I thought was on the side of buses. There was a bus ad campaign in Baltimore in December of 2010. I thought a lot of it was local. Some of it is local. There's a bunch of stuff that's local, the penny saver ads, radio ads. But there's these national organizations that are on the Internet. If you put in abortion, Baltimore, Up Pops, the option line, you put in your zip code, it refers you to the center, as well as the other pregnancy centers in Baltimore. We can't require them to do disclosures on every page of their website. We have no way of effectively preventing that kind of deceptive marketing. What troubles me, and I guess this is when I was talking about the intrusion of compelled speech, I'm worried that a city council with a particular point of view, it could be on the issue of abortion or it could be on many other issues, could require organizations, nonprofits or what have you, that took a point of view that was philosophically opposed to the prevailing view upon the city council and forced upon that organization all kinds of compelled disclosures that would either hobble the organization, turn off patrons, and really conduct through compelled speech a campaign of serious harassment. And the opening that something like this affords for government to take advantage of its philosophical opponents through the medium of compelled speech is quite troubling to me. It goes beyond the issue of abortion. It goes beyond what right does government have to go after with compelled disclosures. These groups are lawful. They're providing free services. They haven't broken the law. And, Your Honor, totally misconstrues Baltimore's objective. In fact, the evidence shows that Baltimore Health Department refers women who want the spiritual counseling, the Christian counseling, the parenting support, the free pregnancy test. Correct. So we're not trying to put them out of business. Perhaps it would be helpful, Your Honor, to remove this from the politically charged context of abortion. Think of a group advertising free cancer treatment medical services. Cancer patients show up at the center and find that all that's being offered is prayer and advocacy that you should only treat cancer with prayer. I think it would be well within the city's jurisdiction, within its authority, to require the posting of a sign, no chemotherapy or radiation provided here. I'm not sure that it's analogous, but what I would suggest to you is, you know, I respect the fact that pro-choice groups and pro-life groups feel a deep sense of principle and conviction about their views on this, what is a very difficult and highly charged issue. And you're miles apart in your view of it on the merits. But I've often wondered, and I've been on cases where abortion providers were stuck by state legislatures with messages that went totally contrary to their point of view. And I'm hoping to strike those down, because I don't like it. Encampments, yes. Yes, they're insecure encampments. I don't like compelled speech. And I wonder whether, despite your, you know, vast gulf of difference on the merits, is there some truth or something that might be reached so that we're not using the weapons of compelled speech to drown out the other side or force the other side into things that it just, as a political or moral or spiritual matter, doesn't believe? I mean, the dialogue has to be different, even in the midst of the most principled and deep-seated disagreement. That's what bothers me. Each side ought to give the other side at least the latitude and freedom to express its point of view. And I've been on both sides. I've sat on cases on both sides of this. I know you have, Your Honor. And Baltimore's disclosure sign really fosters the same principles that you fostered in the Stewart v. Kamenetz decision. It is allowing accurate information to women who are searching personal and time-sensitive medical services so that they can make their own decisions. And it is not the exact argument that was made by the North Carolina legislature in Stewart that a woman, even while she's on the table being examined, should be told that this is what she should look at sonograms of the baby. It was the same argument that was made in behalf of compelled speech. And you differ. You disagree. I completely understand. But it's the same type of thing that we are telling a provider, we are providing, we are saying to a provider, you have to say this, and you have to say it in the way that we tell you to, in the form and way. No. The provider doesn't have to say it. It's a government disclosure on the wall. No one has to say anything. And it's simple, neutral. It's not implying that the government likes abortion. It isn't neutral because what it's suggesting is that this is a legitimate choice among a menu of choices and that it just isn't available here. Not at all. Not at all. In fact, the regulation says they can use their own words. They can say we don't offer abortion because we don't think it's moral or we think it's too risky. It's no more expressing an approval of abortion than a sign in a bar saying minors are not served alcohol here. It's the state's words, not theirs. And they would never put up that kind of thing. Yeah, and it's required because they've been engaging in deceptive marketing practices which are widespread throughout the pregnancy center industry, and there's ample evidence in the record to that effect. I'll reserve the rest of my time for rebuttal. We want to thank you very much. Thank you. Mr. Kinkoff. Good morning. Thank you, Your Honors. And may it please the Court, David Kinkoff on behalf of FLE. It's no longer morning, Mr. Kinkoff. Oh, I am sorry, Your Honor. You've had a very busy morning. You are correct. Good afternoon. Let me begin before I get into my prepared remarks by correcting, I feel the need to correct a point of the record that Ms. St. Green made multiple times when asked about her best evidence of deception. She pointed to Joint Appendix 703, and she said repeatedly, it's an ad that says we offer abortion and morning-after pills. In fact, she deleted the important word that is included in that ad, which says we provide abortion and morning-after pill information, which is something we definitely do. She said that three times. I wanted to make sure Your Honors understood the record. We saw that. Thank you. Thank you, Your Honor. The key issue in this case is whether the speech of Plaintiff Greater Baltimore Center, a Christian ministry staffed largely by volunteers, all of whom sign a Christian faith statement and provide entirely free services, including free diapers, baby formula, and Bible study, whether their speech in their small waiting room located in rent-free space at Ann's Catholic Church, whether that speech is commercial speech. As this Court instructed the lower court and the parties to engage in discovery, context matters, and asked that the parties and the court engage in a context-based discussion. And as Your Honor's discussion just indicated, the narrow tailoring question turns largely on the fact that this ordinance, this disclaimer, this chosen remedy is overly broad because of the impact it has in the undisputed evidence of the record, the impact it has on our center. Absolutely. So tell me what would, in your view, would be narrowly tailored? Well, there are many alternatives that have been suggested by the Supreme Court and other courts. They start with prohibiting, absolutely prohibiting false advertising directly, which government has the direct authority to do. It's what was upheld by the North Dakota Supreme Court in Fargo Women's Health versus Larson. There, there was a prohibition. Aren't there already laws prohibiting false advertising? There are state laws, Your Honor. The city has some laws regarding false advertising, which they have never attempted to enforce. There is no record at all that they have looked at enforcing their false advertising laws, that they have amended, if necessary, as they can under their police powers, their existing anti-fraud laws to cover false advertising by pregnancy centers. And it is very clear this was another basis on which four years ago this court sent us back for discovery so that the city could prove those kind of less restrictive alternatives are ineffective. There is zero proof in the record that they even considered, let alone have proven ineffective, those obvious alternatives of prohibiting free speech, of prohibiting, excuse me, prohibiting, we don't want them to do that, prohibiting false advertising, maybe at a stretch requiring a disclaimer on allegedly false advertising itself, and certainly engaging in the government's own educational campaigns, which it does on other issues. The record is replete with, we go through and we talk to the city's health commissioner about real health issues in the city, substance abuse, needle exchange programs, HIV testing. They talk about those things. Those are on their website. And they engage in public information campaigns. They never thought about or attempted public education around this. And yet, as Your Honor has just heard, the city refers women to our center, including on their website, through their website for free pregnancy tests. They don't know what the women, what services the women are or are not looking for. And yet they do not include a disclaimer telling those women who they're sending to our center of the services we don't provide. Your Honor, the undisputed facts in the discovery tell us what kind of speech is at issue here. It's undisputed that the center itself tries to convey in the place where this disclaimer would hang a welcome, comfort, security, and warm spiritual message. That's what they're trying to convey in their waiting room. The materials in this waiting room include copies of the Bible, children's books and toys, and a small statue of Jesus Christ. They're in the waiting room. And it's undisputed in the waiting room. This court said context matters, including the viewpoint of the listener. There's only one testimony from someone who's been to the waiting room to receive services. It's in the record, an affidavit from a woman named Carolyn Ambrose. Here's what she says. She says that I went to the center for emotional, spiritual, and material support. She came with her family. They prayed in this waiting room with the center staff, in the center's waiting room, at her request. The center provided her with nonjudgmental emotional support. And the center also provided her with free diapers, free wipes, free clothes, free baby formula, free stroller to assist her in caring for the child. She always found the center's waiting room to be open and inviting. They never discussed abortion because she sought, this is her testimony, she sought the center's help in order to keep her children. And here's the key to the context, I think, Your Honor. The ordinance disclaimer would have been upsetting to me. That's the testimony of the only person who's gone to the center looking for services. And it would have impacted how I view the center. That's what she said. It's not only that it presents abortion as one of a menu of options, of legitimate options, which it may be, but it's not the center's view. Correct. But it's jarred with everything else that is in the waiting room. And it just, it almost sets the organization against itself. Well, absolutely, Your Honor. The record is replete with testimony despite Ms. Sangree's attempt to minimize the center's testimony about the impact that this disclaimer has on their conversations. But the center is replete with both the affidavit and the center director's own testimony. She calls it a stark and immediate statement about abortion that alters the course of the communications, the center's communications with all of its visitors, right? It undermines their attempt to convey care and support. It implies that abortion could be considered a good alternative. How long the discovery was. Is it plain here that the mandate of the earlier invite court was disregarded earlier? No, Your Honor. It was set back for extensive discovery. How long was the discovery? It was about three years, extensive written discovery, extensive depositions, including the city noted depositions from national pro-life groups around the country. They conducted depositions throughout the United States and got every piece of document they wanted from us. Absolutely, Your Honor. It was extensive. Is there anything that you would feel comfortable saying that you think could be communicated non-disruptively to make people, make women aware early in the process that abortion is not something, is not a service you provide? Yes, we can and we do, Your Honor. And how do you do that? Well, let me get to that, and Your Honor, I'm glad Your Honor raised it because also in the context of the allegedly problematic advertising, staff is trained and it's undisputed that they tell every woman who asks about abortion services that they are not provided at the center and the center will not refer for them. So it's undisputed in the record that every woman who was momentarily confused by any ad was told immediately when they called about that confusion that the center does not provide or refer for abortions. And the center also has its own commitment of care. It's in the joint appendix. And it is its welcoming, supportive context of what it tries to convey. And one of the items, one of the nine items on the center's commitment of care says very clearly that the center does not provide or refer for abortions or birth control services. And it's in the context of commitments like non-discrimination, honesty, kindness, training, care and support. So it's said very much in the center's way and supportive way and in a way that allows the woman who they're talking to understand that she can have a baby with the support of the center, not that she would see a stark, cold government warning. And the government's intention is clear in the record. They want women to come in and immediately leave the center if they see that sign and they're not interested. We want to talk with women about the kind of care that the center provides. And in the Riley case and in the Evergreen decision that's been discussed here, there's a clear discussion about the problem with how the government mandates this information be provided. There's nothing in the record that any woman has ever been, has ever come to the center thinking that she can get an abortion at St. Ann's Catholic Church. There's nothing in the record to suggest any harm has been done. One of the things in trying to think about the standard of review here, I don't see how this is commercial speech, because the waiting room is not proposing a commercial transaction. But I think even more importantly, I wonder whether for both sides, a subject that has such political, ideological, moral, spiritual import, it would seem to be one of the worst candidates to sort of label, oh, it's just commercial speech. It's as far from cigarette ads or whatever as one can imagine. So I'm not sure how we've reached such a relaxed standard of review through the medium of commercial speech, because I realize that it does advertise and that it's a member of the Chamber of Commerce and all these things. But the topic itself seems to me political speech and ideological speech are at the very least intertwined speech. So I just don't understand how this subject, of all subjects, gets thrown in the basket of commercial speech as some evidence. Maybe discovery could have revealed that evidence. But it doesn't seem to me this is a real good candidate for commercial speech in a relaxed standard of review. I agree, Your Honor. And the record disclosed no such evidence. That's why I ask you. It's so important that the court's mandate had been observed, because if there was evidence of a commercial transaction of some sort being taken place in that waiting room, but I don't understand that there was. No, absolutely not, Your Honor. The evidence is undisputed that there are no ads in the waiting room, that there's no commercial transactions taking place in the waiting room. There are no referral fees. Even stronger than the Tepeyac case, Your Honor, where there was some de minimis money coming back from a couple of the clients as a donation. There's none of that in our record. Because I understand that the services provided are free. Absolutely, every one. So you have free services and you don't have a commercial transaction in the waiting room and there are no fees that are charged? Neither in the waiting room or anywhere else. And there's no referral fees based on any referrals that our center makes through adoption agencies, et cetera. So that's important, what that discovery shows. Yes. That not only, what I guess I'm trying to say is that not only is the subject and different feelings about the question of reproductive choice and abortion seem pretty far removed from political speech, but the actual context here in the waiting room seems to me well removed. It's both the subject itself and the implementation. I completely agree, Your Honor. Now the city, just a preview, the city had concerns about the scope of their discovery as to these out-of-state national organizations. They filed a motion to compel, and there was some dispute about that, decided by the first magistrate judge below and then the district court below. They've waived that here on appeal. That had nothing to do with our waiting room or our center. It had to do with how far they could go exploring with these national pro-life groups. So the city may come up and say that, but they waived that, and there's no doubt that in the three-plus years of discovery, the city had every opportunity, and they deposed our people, they got all of our records, and there's nothing about commerce. Presumably, Baltimore would have to appoint the centers within its jurisdiction. Presumably, Your Honor. Is there medical evidence in the record of any health concerns arising from delay, associated delay? No, Your Honor. Thank you for that question because quite to the contrary. Both the city's 30B6th opponent, their designee, and the city's own public health expert say expressly that there is no evidence of any harm or delay to any woman who's visited a pregnancy center. That's at Joint Appendix 1008, the city's 30B6th designee, 1008. And the city's expert, let me quote the city's expert on public health, Dr. Bloom. He says, quote, I'm not aware of harm that has been caused by going to a crisis pregnancy center. That's Joint Appendix 1143. It's undisputed that there's not a single woman who has gone to a pregnancy center in Baltimore City thinking to receive an abortion. No woman has gone to a pregnancy center in Baltimore City and been harmed. No woman has gone to a pregnancy center and been delayed. Your Honors, I'm almost out of time. I've addressed most of it. Nobody has to take their full time. Well, I thought Your Honors might appreciate that. I know it's already been a long day. I'm most welcome to answer any questions you all might have, but I think we've covered a lot of the material here. It's an important case, and we want to make sure that everybody has the time to get that information. Okay. Thank you, Your Honors. Ms. Sandra, you have some rebuttal time. Thank you, Your Honors. Did you get the discovery you needed? Because I want to make sure that this court's mandate was meticulously observed. We did. We did. There were some inappropriate limitations that we objected to, but we do not raise those on appeal at this point. On the health harm, Dr. Blum at JA 1145 and 1150 spoke about women that he personally had treated who had been to pregnancy centers and been delayed by days and weeks in their access to abortion. I had asked about health harm. That's a health harm, yes. Did you say that? Is that the testimony? Yes. Okay. Casey also talks in his declaration that women's access to abortion, girls who had been to these centers, were delayed days and weeks. And Casey recognizes that access to abortion services is time sensitive. He cited one instance where a girl was pushed into a second trimester abortion, which increases the costs and risks. Let me ask you this. The delay, I've read a lot about the delay, but is the delay attributable to some subterfuge or blocking action on the half of the center, or is the delay simply the delay that many women understandably experience in the course of making a very difficult decision in trying to weigh the alternatives? And I think that the delay in getting an abortion often takes place way outside the center, and that is because the decision is hard. It's just difficult. And so I don't think if there's a delay that that can be automatically just written up to the center. Well, Judge Duncan identified the first source of delay, which is the misleading advertising, which brings the women to the center in the first place seeking an abortion that's not offered there.  But then in the record at 903.04.758, women are required to undergo at least 45 minutes of counseling before they're provided with a pregnancy test. That's in the center's procedure manual. And if they say, I don't want counseling, I just want the pregnancy test, they're told, no, sorry, you can come back another time when you have more time. In addition, they're encouraged, if they're abortion-minded, meaning they've made up their mind to have an abortion, they're encouraged to have a sonogram before they go ahead with that decision. And yet the sonographer is not there every day, and they're encouraged to come back days if not weeks later to have the sonogram performed. Well, those are delay tactics. You were asking about delay. What are the sources of delay? A sign on the wall, these women are being lulled, some of them, into thinking, as in the Larson case, as in the Herrera case, the Harris case, the Ninth Circuit. I'm sorry. Mr. Kimcoff said, and my recollection was to this effect also, that if someone asks for an abortion, do you have an instance of someone who asks for an abortion who is not disabused of the notion that the center doesn't provide them? He presented it as unconflicted testimony. That's why I'm asking you. Do you have someone who asked for an abortion and asked if the center provided abortions and was misled about them? We don't have that, but we have a statement from CLUES that if a woman doesn't specifically, she's the executive director of the plaintiff's center. You're relying on their response. What I'm asking about is the question. Assuming that there is a question, which is what he said, I'm only trying to understand where the— If I have a clear sense of where the misunderstanding comes in, it seems to me it's a little easier to think about the best way to fix it. For example, if when a woman comes in and says— I know what you mean. Before the city council were Congressman Waxman's report, as well as the NARAL report. They documented that testers who called to schedule abortions were not immediately told there were no abortions, and they were encouraged to come in for appointments. Excuse me? Where? The NARAL report did cover centers in Baltimore. What we have concerning the Baltimore center is a statement from Carolyn CLUES that unless a woman specifically asks whether you provide abortions, she will not be told. She claims in one place that she tells everyone, and then she acknowledges no. You see, this is another example. That was really my question. If a woman is not told that we provide abortions, that's not affirmatively— Your objection is that it is not affirmatively presented. It has to be asked about. And that's why I'm having— I'm not quite sure why there's a problem with that. Okay, Your Honor. There is evidence in the record before the city council of widespread deceptive practices by the parts of the clinics specific to Baltimore. But it's pretty spongy. What if the center committed to communicating with a woman who comes in and who mentions abortion, I'm sorry, we do not provide abortions. That was a part of their discussion. And that was upheld in Herrera as well as in Evergreen, that both they have to be told we don't provide abortion and post on the wall no licensed health care provider here. Please don't go past my question, okay? Because I'm really trying to come up with something that addresses a very legitimate concern about the city putting words in their mouth and putting it on the wall. If, and also it's clarity, if the center says as a part of its discussion with the woman, these are the services we offer and doesn't include abortion, I'm not sure where the deception there arises. If that's what they... Yes, I agree. That's not deceptive, but... No, no, no, no. Can you just stay with me because I'm not... Okay. Actually, trust me, I'm not really trying to argue with you. I trust you. Okay, thank you. I'm just trying to come up with... There are sensitivities here. There are legitimate sensitivities and I'm trying to flesh out if there's any way to address concerns about deceptiveness and concerns about the message. So you see where I'm going with this? Not talking about the sign on the wall, but talking about within the discussion, there has to be some affirmative obligation on the part of the woman to raise an obligation on the part of the center. That's all I'm saying or suggesting. And the sign on the wall doesn't do that. You see what I'm saying? That just puts it out there before somebody even asks. So it shapes the conversation. But doesn't the woman have some obligation to put the center on notice that that's in her line of sight to justify a corresponding obligation to prevent deception on the part of the center to say, no, that's not what we do here? I think that would be true if they weren't engaging in deceptive marketing practices. But that assumes the answer to an inquiry that I'm not sure has been answered. So that was why I was asking you to stay with me on my question. Well, for example, in the Tepiak case, there wasn't any evidence of a misrepresentation of what services the center there offered. And so a disclosure sign was deemed to be inappropriate. Women aren't being told you can get licensed prenatal care here, and so why would the center have to post a sign you can't get it here? But in our case, women are being told they can get abortion alternatives, morning after pill, sonograms, medical services. But those are not offered. Thank you. You were going to tell us about the Evergreen case where the Second Circuit Service's disclosure of paulking was dictated. Yes. So they don't use the word redundant. That was my shorthand in my notes. But if you look at page 249 of the decision, 740F3rd, 249, the top left column, however, on this record, the status disclosure by itself might narrowly tailor the city's interest as it alerts consumers to a small bit of accurate information about the type of services each center provides, medical or nonmedical, even though it does not discuss those services. So it had just upheld the status disclosure saying no licensed medical providers here, and now it's in the services disclosure saying we're striking it down because the status disclosure has already fulfilled the government's purpose. It doesn't appear to be what they say, because they specifically discuss, because I just reread it, exactly what the constitutional speech problem is of underserved student and intermediate student. I don't see how their discussion follows that. It jibes with what you just told us. Well, I disagree with you on that point, Your Honor. I think the Second Circuit upheld the status disclosure on the wall and said that fulfilled the government's purpose of clarifying what types of services are offered there, so you didn't need to then delineate. We don't need to drag this out. The services disclosure is about compelled speech, which is what the Second Circuit wrote about in that section. So I guess we'll just have to read it the same way. But the status disclosure is also compelled speech, but it fulfilled the government's interest. We don't have that in this case. We have the services disclosure. That's why I've been asking you about this case, is why yours is different from the Second Circuit. Ours is different because what's being marketed is not licensed medical services. Specifically, it's abortion services morning after pill. What medical services are also being marketed, but the Baltimore Council responding to the public health advice of its health commissioner that we need our public health messages to be at a fifth-grade reading level. Women are seeing abortion alternatives advertised. They're coming to the center to obtain abortions. The sign should say simply, no abortions provided or referred for. It wasn't a concern that pregnant women were coming to get prenatal care or other licensed medical care there. So our status disclosure, as you will, of what services are offered, is tailored to the problem in Baltimore. And as we know, a city is not required to wait until after a harm has already occurred in order to remedy it. That's from the turn of broadcasting Supreme Court decision. And so... I think we understand your point of view. Okay, thank you. Thank you so much. We will adjourn court. Thank you both for your arguments. We will adjourn court. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, G. Steven Agee